1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

MANSOUR AREKAT,                )
individually and in his        )
capacity as chief              )
operating officer and          )
owner of Arekat Pacific        )
Security, Inc., a              )
Hawaii corporation dba         )
A.P.I. Security, Inc.,         )
                               )
                Plaintiff,     )
                               )
        vs.                    ) CIVIL NO. 03-00710 HG/KSC
                               )
LEE D. DONOHUE, LETHA          )
DE CAIRES, MIKE                )
MIRANDA, CITY AND              )
COUNTY OF HONOLULU, and        )
JOHN DOES 1-25,                )
                               )
                Defendants.    )
                               )


        DEPOSITION OF SAMMIE L. DIXON

Taken on behalf of the Plaintiff, pursuant to
Notice, on Wednesday, April 13, 2005, commencing
at 10:05 a.m., at the offices of Trecker & Fritz,
820 Mililani Street, Suite 701, Honolulu, Hawaii
96813.

Reported by:
    Don A. Ross, CSR No. 250
    Notary Public, City and County of Honolulu

Page 2

```
 1  APPEARANCES:
 2       For Plaintiff:
 3            ERIC A. SEITZ, Esq.
              LAWRENCE I. KAWASAKI, Esq.
 4            820 Mililani Street, Suite 714
              Honolulu, Hawaii  96813
 5            (808) 533-7434
 6       For Defendants City and County of Honolulu,
         Lee D. Donohue and Mike Miranda:
 7
 8            D. SCOTT DODD, Esq.
              Deputy Corporation Counsel
 9            530 South King Street, Room 110
              Honolulu, Hawaii  96813
10            (808) 523-4702
11       For Defendant Letha De Caires:
12            JAMES P. DANDAR, Esq.
              Davies Pacific Center
13            841 Bishop Street, Suite 801
              Honolulu, Hawaii  96813
14            (808) 552-1711
15       For Defendant Mike Miranda:
16            LYLE S. HOSODA, Esq.
              345 Queen Street, Suite 804
17            Honolulu, Hawaii  96813
              (808) 524-3700
18       For Defendant Raymond Anchete:
19            CARY T. TANAKA, Esq.
              Topa Financial Ctr. Bishop St. Twr.
20            7000 Bishop Street, Suite 2001
              Honolulu, Hawaii  96813
21            (808) 536-8895
22       ALSO PRESENT:  Mansour Arekat
23
24
25
```

Page 3

```
 1                I N D E X
 2
 3   EXAMINATION:                      PAGE
 4   BY MR. SEITZ                        4
 5
 6   BY MR. HOSODA                       4
 7
 8   BY MR. DANDAR                       4
 9
10   BY MR. TANAKA                       4
11
12   BY MR. DODD                         4
13
14
15
16   EXHIBITS REFERRED TO:
17   Exhibit 1                          20
     (1-page Statement Letter,
18   18 August 2004)
19   Exhibit 2                          55
     (1-page hand-drawn sketch)
20
21
22
23
24
25
```

Page 4

1  (Pursuant to Rule 14, of the Rules Governing
2  Court Reporting in Hawaii, the reporter's
3  disclosure was made and is attached hereto.)
4               SAMMIE L. DIXON
5  having been called as a witness and being first
6  duly sworn to tell the truth, the whole truth and
7  nothing but the truth, was examined and testified
8  as follows:
9               EXAMINATION
10 BY MR. SEITZ:
11    Q. Would you state your full name,
12 please.
13    A. Sammie L. Dixon.
14    Q. Mr. Dixon, what's your current mailing
15 address?
16    A. 94-1049 Ponohana Way.  That's in
17 Waipahu.
18    Q. And let's have the Zip Code so he can
19 send you a notice if he needs to.
20    A. 96797.
21    Q. Mr. Dixon, have you ever had your
22 deposition taken before?
23    A. No.
24    Q. Prior to this morning, you and I went
25 over some of the procedures pertaining to a

Page 5

1  deposition.  Is that correct?
2     A. Yes.
3     Q. Let's just go over them for the record
4  so the record is clear.
5        You understand, first of all, that the
6  testimony you're giving this morning is under
7  oath.  Is that right?
8     A. Yes.
9     Q. I've also reminded you to answer
10 verbally, as you're doing.  Right?
11    A. Yes.
12    Q. And I've also suggested to you that if
13 somebody asks you a question that's not clear,
14 that instead of answering it, that you ask that
15 the question be restated or clarified until you
16 do understand it?
17    A. Yes.
18    Q. And the reason for that is we want to
19 make sure we have a clear record because the
20 testimony you give today can be used in court.
21 And you understand that, right?
22    A. Yes.
23    Q. If you have any need for a break at any
24 time, just tell us, and we'll go off the record.
25 Okay?

Page 6

```
1    A. Okay.
2    Q. Lastly, I want to tell you that you'll
3  have the right to read and make any changes to
4  your testimony after it's transcribed.
5        However, in doing so, you need to
6  understand that somebody may later comment about
7  the fact that you've made changes and how that
8  bears upon your credibility.
9        Do you understand that?
10   A. Yes.
11   Q. Would you please tell me what your age
12 is.
13   A. Forty-six.
14   Q. And are you currently employed?
15   A. Yes.
16   Q. How are you employed?
17   A. Through API Security and also as a
18 screener, TSA baggage screener.
19   Q. And how long have you worked at those
20 two jobs?
21   A. With API Security, over three years.
22 And a TSA baggage screener, just over six
23 months.
24   Q. And what is your job with API?
25   A. Personnel manager.
```

Page 7

```
1    Q. Where do you actually perform your
2  duties?
3    A. In the office.
4    Q. Where is the office located?
5    A. 1350 South King Street, Suite 205.
6    Q. Were you employed in that same position
7  on December 15th of 2003?
8    A. Yes.
9    Q. Prior to being employed by TSA and API,
10 how were you employed?
11   A. Military.
12   Q. And what branch of the military were
13 you in?
14   A. U.S. Navy.
15   Q. How long were in the navy, sir?
16   A. Twenty-three years.
17   Q. Did you eventually retire from the
18 navy?
19   A. I retired August 30th of last year.
20   Q. When you retired, what was your rank?
21   A. E-7, chief petty officer.
22   Q. I want to call your attention to
23 December 15th, 2003 at approximately five o'clock
24 in the afternoon.
25      Were you working at API that day?
```

Page 8

```
1    A. Yes, I was.
2    Q. And I've provided in front of you a
3  copy of a document that says "Statement Letter,"
4  dated 18 August, 2004.
5        Do you have that document in front of
6  you?
7    A. Yes.
8    Q. Is that your signature at the bottom?
9    A. Yes.
10   Q. Is that also the date that you wrote on
11 it?
12   A. Yes.
13   Q. Have you reviewed this particular
14 document recently?
15   A. I have.
16   Q. And is there anything about this
17 document which you would want to alter or change
18 in any way?
19   A. No.
20   Q. To the best of your knowledge, is this
21 document an accurate recollection of what took
22 place on 15 December, 2003?
23   A. Yes, it is.
24   Q. Who asked you to write this statement?
25   A. I volunteered to write it.
```

Page 9

```
1    Q. And to whom did you give the statement
2  after you wrote it?
3    A. To Mansour.
4    Q. And Mansour is your boss?
5    A. Yes.
6    Q. Now, calling your attention to this
7  occasion, you recall that you were at work at
8  approximately five o'clock on December 15th and
9  you heard a knock on the door.  Is that correct?
10   A. Yes.
11   Q. And you said you partially opened the
12 door.  Is that right?
13   A. Yes.  I didn't know who it was.
14   Q. Was the door locked?
15   A. The door was locked.
16   Q. And when you opened the door, what
17 happened?
18   A. I seen several armed individuals
19 wearing -- carrying guns and a shield and
20 headgear.
21   Q. And did you invite them into the
22 office?
23   A. No, I did not.
24   Q. Did you give them permission to enter
25 the office?
```

Page 10

1    A. No, I did not.
2    Q. What happened when they entered the
3 office?
4    A. They immediately searched -- one of
5 the officers asked me where Mansour was, and I
6 told him I didn't know. But meanwhile, while he
7 was talking to me, the others came through the
8 door and started searching all the office area.
9    Q. Did you give them permission to
10 search?
11    A. No, I did not.
12    Q. Did anyone give them permission, as far
13 as you know?
14    A. No. No words were spoken except
15 between one of the officers and myself. And the
16 rest just came in.
17    Q. Was anybody else in the office other
18 than you when the officers entered?
19    A. No. I was the only one.
20    Q. You said they had their weapons out?
21    A. Yes.
22    Q. Can you describe what you mean by
23 that?
24    A. They were carrying weapons, like short
25 machine gun type of weapon. I'm not sure what

Page 11

1 it's called.
2    Q. You've been around weapons before, is
3 that correct, in the navy?
4    A. Just handguns.
5    Q. And how they handled those weapons, how
6 did that affect you?
7    A. Seeing the weapons and how they were
8 being carried, I was scared to death.
9    Q. Were any of the weapons ever pointed in
10 your direction?
11    A. Close -- for me, I think so. Close
12 enough, the way they were. That's why I was very
13 nervous.
14    Q. Did they ask you at any time if you
15 would consent to their coming into the office?
16    A. No, they did not.
17    Q. Did they ask at any time if you would
18 consent or agree to them looking around or
19 searching the office?
20    A. No, they did not.
21    Q. How long were these officers there
22 before they left?
23    A. I would say approximately ten minutes.
24    Q. And when they left, did they say
25 anything to you?

Page 12

1    A. The individuals searching the office,
2 no. They just left. But under -- the person
3 that was with me, he was asking where Mansour was
4 and where he lived, and I wouldn't give him that
5 information.
6    Q. Did that individual also ask for your
7 name?
8    A. I don't recall if he asked for my
9 name. But we were having discussion, and I
10 believe he asked my name in a casual way when we
11 had a little chitchat. But not right off the
12 bat, no.
13    Q. In your statement, you say that this
14 officer remained while the other officers left.
15 Is that correct?
16    A. That's correct.
17    Q. Was this officer who remained a male or
18 a female?
19    A. It was a male.
20    Q. And did you ever get his name?
21    A. I don't recall.
22    Q. Do you remember anything about him so
23 that you could describe him?
24    A. No. I was still in shock, so, no, I
25 don't remember.

Page 13

1    Q. Okay. Did that officer who remained in
2 the office with you remain there until other
3 people arrived?
4    A. Yes.
5    Q. And did he use the telephone or do
6 anything while he was there?
7    A. He made a few -- I know he made at
8 least one phone call.
9    Q. Did he ask for permission to use the
10 phone before he did so?
11    A. I don't recall.
12    Q. I think you then said about an hour
13 later an individual by the name of Chris
14 arrived. Is that correct?
15    A. Yes.
16    Q. Who is Chris?
17    A. Chris at the time was operations
18 manager.
19    Q. And do you know Chris' full name?
20    A. Chris Dallesion.
21    Q. And when Chris arrived at the office,
22 did you overhear any conversation between Chris
23 and the police officer who was there?
24    A. The fact that he asked him if he had
25 the key to Mansour's office, and Chris responded,

Page 14

1 no, he did not have it.
2    Q. Was there any other conversation that
3 you recall between the officer and Chris?
4    A. No.
5    Q. Did Chris then remain at the office
6 with you until other people arrived?
7    A. Yes.
8    Q. At some point, then, after Chris had
9 arrived, in your statement, you indicate that
10 Mansour arrived, accompanied by several heavily
11 armed officers. Is that correct?
12    A. Yes. But prior to Mansour arriving, a
13 female officer arrived.
14    Q. Okay. And what happened when the
15 female officer arrived?
16    A. She immediately wanted to get the keys
17 to Mansour's office, which was asked of Chris,
18 and he responded that he didn't have the keys.
19 But her insistence was to get in the office and
20 her interest in getting in the office was the
21 impression I got from her. Even though Chris
22 said he didn't have the keys, she still wanted to
23 get in the office.
24    Q. Did anyone ever give that female
25 officer permission to enter the office?

Page 15

1    A. No, I did not.
2    Q. Did you hear anybody else give her
3 permission?
4    A. No.
5    Q. Let's go to the next point, which is, I
6 believe, when Mansour arrived, accompanied by
7 other armed officers. Is that correct?
8    A. Yes.
9    Q. What happened then?
10    A. They came in the office and they
11 immediately went over to the area where his
12 office was. And that's where Chris and the
13 female officer met him, and they had a discussion
14 of getting in the office. And Mansour's response
15 was, "Do you have a search warrant?"
16    Q. And what did the officers respond?
17    A. I'm not sure exactly what the
18 conversation was, but I know he adamantly
19 requested for a search warrant.
20    Q. And then what happened?
21    A. At that point, I had gotten up and went
22 to the other office and got a stapler and came
23 back; and that's when I saw the female officer
24 grab the keys and went towards Mansour's door.
25    Q. Where did she grab the keys from?

Page 16

1    A. From him.
2    Q. From Mansour?
3    A. Yes.
4    Q. Did you ever hear Mansour give
5 permission to the female officer or to anyone to
6 go into his office?
7    A. No.
8    Q. Did the female officer then unlock the
9 door to Mansour's office?
10    A. Yes.
11    Q. And who went inside?
12    A. At that point, she was at the door, and
13 her and a couple of other officers went inside.
14 And that's when I walked back to the desk.
15    Q. Mr. Dixon, are you getting ready to
16 leave your employment and move to another
17 location?
18    A. Yes, I am. I applied for the merchant
19 marine, and I'm in a selection process now. And
20 I should know in a week or two whether I've been
21 selected.
22    MR. TANAKA: Could you repeat that? I
23 didn't hear.
24    THE WITNESS: I applied for the
25 merchant marine.

Page 17

1    MR. TANAKA: Okay.
2    THE WITNESS: And I've been accepted
3 for initial review. And upon being reviewed, I
4 may be selected within the next few weeks.
5    MR. TANAKA: Thank you.
6    Q. BY MR. SEITZ: And if that happens,
7 you'll be relocating from Hawaii, is that
8 correct?
9    A. That's correct.
10    MR. SEITZ: I have no further questions
11 of Mr. Dixon.
12    EXAMINATION
13 BY MR. HOSODA:
14    Q. Good morning, Mr. Dixon.
15    My name Lyle Hosoda. I represent one
16 of the police officers that has been sued in this
17 lawsuit.
18    I have just a few questions for you.
19    What was your -- what were your duties
20 and responsibilities as personnel manager for
21 API?
22    A. Take care of all the records coming
23 into the office, and inputting them in the
24 computer and also doing the payroll, transferring
25 data onto the payroll roster for submitting for

**Page 18**

1 the employees to be paid.
2    Q. What were your regular work hours?
3    A. Regular work hours is -- was about
4 nine to about four.
5    Q. And would that be every day?
6    A. At the time, I was still in the
7 military, so it was part-time hours. So I would
8 come in when I was available.
9    Q. Let me take you back to the period
10 around December 15th of 2003. What were your
11 regular work hours?
12    A. I come in evenings.
13    Q. Would you come in at the same time
14 every day?
15    A. No. It would be different times
16 because certain days I'd be off with the
17 military, so I'd come in early to work for API.
18    Q. Is there anything that we could go back
19 to in terms of a record, a log sheet, a time
20 sheet, anything like that, to see when it is that
21 you were at work at API during that period of
22 time?
23    A. Yeah, there should be documents showing
24 what time I actually logged in.
25    Q. What documents would those be?

**Page 19**

1    A. Payroll journal, payroll roster, which
2 would account for my hours.
3    Q. How were you compensated at that time?
4 By the hour?
5    A. Hourly.
6    Q. What --
7    A. So I had to log in and log out.
8    Q. What was your rate of pay?
9    A. At the time, I think it was ten dollars
10 an hour, ten to eleven dollars an hour.
11    Q. Other than the administrative tasks
12 that you've just described, were you involved at
13 all in operations yourself, any of the operations
14 that went on for API?
15    A. No.
16    Q. Do you know what operations that API
17 did?
18    A. Getting clients.
19    Q. What kind of clients?
20    A. That looked for security guard
21 services.
22    Q. To your understanding, is that the only
23 business that API did, they were in the business
24 of providing security guards to places?
25    A. Yes.

**Page 20**

1    Q. Is there anything else that you're
2 aware of that API was involved in at the time
3 that you were employed in December of 2003?
4    A. No.
5    Q. Do you have any training, background or
6 experience in weapons?
7    A. No.
8    Q. In your statement, which is Exhibit 1
9 to your deposition, you say in the second line
10 that the door was pushed open by a heavily armed
11 person.
12       Tell me what you mean by "heavily
13 armed."
14    A. Full riot gear: Face shield, arm
15 shield and carrying a gun. And, like, they had
16 flight jackets or body-piercing -- what do you
17 call that? -- bulletproof vests.
18    Q. Did they have a weapon, as well?
19    A. Yes.
20    Q. What type of weapon did they have?
21    A. Like a machine gun, miniature machine
22 gun. I'm not sure what it's called.
23    Q. And that individual pushed his way
24 through the door?
25    A. They came in, yes.

**Page 21**

1    Q. Are you aware that there are video
2 cameras or camera surveillance of your premises,
3 the API premises?
4    A. Yes.
5    Q. Have you reviewed the videotape of
6 December 15th, 2003 of API's premises?
7    A. Briefly.
8    Q. When is the last time that you reviewed
9 that tape?
10    A. I don't recall.
11    Q. Why was it that you reviewed that
12 tape?
13    A. To see, you know, basically, how scared
14 I was and why they came -- and them coming in.
15    Q. Did you review that with Mr. Seitz?
16    A. No.
17    Q. Did you review that with Mr. Arekat?
18    A. Yes.
19    Q. Where did the two of you review the
20 tape?
21    A. In the office.
22    Q. And about what time period did you
23 review the tape? Was it shortly after the
24 incident --
25    A. Shortly after.

Page 22

1    Q. -- of December, 2003?
2    A. Yes.
3    Q. When is the last time that you reviewed
4 that tape?
5    A. That was the only time, shortly after.
6    Q. One time?
7    A. Yes.
8    Q. Did you see in that tape when that --
9 the incident you described where the heavily
10 armed person immediately pushed open the door,
11 did you see that part of the tape?
12    A. I believe so. I'm not really sure.
13    Q. As you sit here today, can you recall
14 actually seeing the door being pushed open by the
15 heavily armed person?
16    A. I'm not sure. But the door has a
17 spring, so it closes automatically. So I didn't
18 open the door. So the door had to be -- if the
19 door is not held, it will close automatically.
20    Q. My question, though, Mr. Dixon, relates
21 to actually what the videotape shows when you saw
22 it.
23        Did you actually see -- can you see the
24 door being opened in the video that you saw?
25    A. Yes.

Page 23

1    Q. And you can see actually the door being
2 opened and your getting pushed back as the
3 heavily armed man pushed his way through?
4    A. Stepping aside, yes.
5    Q. And you recall seeing that on the
6 tape?
7    A. Yes.
8    Q. And on the videotape, do you also
9 recall seeing other heavily armed officers come
10 into the office as you've described today?
11    A. Yes.
12    Q. How many officers were in that office
13 during that time period?
14    A. I don't know the exact numbers, but I'd
15 say probably three to five officers came in. I'm
16 sorry -- yeah, three to five.
17    Q. And your best recollection is that you
18 could actually see the entry, the forced entry,
19 alleged forced entry, into the premises from the
20 video camera?
21    A. Yes.
22    Q. How many video cameras are there that
23 survey the premises of API Security?
24    A. I don't know the exact numbers.
25    Q. Is there more than one?

Page 24

1    A. Yes.
2    Q. Do you know where the placement of the
3 cameras are at API Security?
4    A. Only the one by the door.
5    Q. And where -- describe where that is.
6        Is it right above the door?
7    A. Yes.
8    Q. Could you see your facial expressions
9 from the camera and the video that you saw?
10    A. Yeah, I think so.
11    Q. And you could see that you were, as you
12 described -- I'm sorry. Was it shocked?
13    A. Stunned, shocked.
14    Q. And in reviewing the videotape, you
15 could see that on your face?
16    A. Not -- no. The quality of the picture
17 wasn't that good.
18    Q. Could you see your face at all?
19    A. I believe so, yes.
20    Q. So the camera was in a position where
21 you could actually see your face as the door was
22 pushed open?
23    A. Yes, I think so.
24    Q. The guns drawn by any of the
25 individuals that came in that were heavily armed,

Page 25

1 were they pointed in your direction at all?
2    A. Yes, the guns were out shoulder high.
3 Not shoulder high. Waist high [Demonstrating.]
4    Q. And they were as you just described, as
5 you pointed out, they were aimed in your
6 direction?
7    A. In my direction, yes. That's why I got
8 very nervous and afraid.
9    Q. At any point after they came in, did
10 you ever ask any one of the officers why they
11 were doing what they did?
12    A. No. I was stunned. I was stunned.
13 Why were they there?
14    Q. When you were stunned, how long did
15 your being stunned or shocked last?
16    A. I think until after they all left.
17    Q. Did they prevent you from using the
18 phone at all?
19    A. I never asked to use the phone, so...
20    Q. Between the time that they first
21 entered the door and the time that all the
22 officers in this entire incident left, when they
23 all left, how long a period of time was that?
24    A. Repeat the question again.
25    Q. Sure. From the time that they came in

Page 26

1  until the time that everybody left when this
2  incident was over in terms of being at the API
3  premises, how long was that?
4      A. I would say approximately a little over
5  an hour.
6      Q. And did you watch the video, the entire
7  video, from start to finish, more than an hour
8  period that you just described?
9      A. No.
10     Q. What period of time did you watch the
11 video?
12     A. Just the entry while I was there.
13     Q. Did you seek any medical treatment as a
14 result of what you experienced?
15     A. No.
16     Q. Did you get any counseling or have to
17 see anybody in the mental health care profession
18 as a result of what you saw?
19     A. No.
20     Q. Were you prevented from using the
21 telephone during that hour-plus while this
22 incident was happening?
23         MR. SEITZ: Objection.
24         It's been asked and answered.
25         Go head.

Page 27

1          THE WITNESS: I never had to use the
2  phone. I never asked to use the phone, so I
3  wouldn't know if they would prevent me from using
4  the phone or not.
5      Q. BY MR. HOSODA: Would it be your
6  testimony that you did not use the telephone
7  during that period of time?
8      A. I did not, no.
9      Q. I'm sorry. You did not, no?
10     A. No.
11     Q. You may have used it, then?
12     A. No, I did not use the phone.
13     Q. So there was a period of time where you
14 testified that one officer was left behind,
15 correct?
16     A. Yes.
17     Q. During that time that he was there, did
18 you use the telephone at all?
19     A. I did not, no.
20     Q. You work at a computer, is that right?
21     A. Yes.
22     Q. Were you so stunned and shocked that
23 you could not go about doing your business on the
24 computer?
25     A. I was still nervous, so I had to be

Page 28

1  very focused on what I was doing because I was
2  dealing with payroll for approximately a hundred
3  employees. So it took me a little bit to get my
4  act together.
5      Q. You recall that day you were actually
6  working on payroll?
7      A. Yes.
8      Q. So you went about your business and
9  were actually able to work on payroll while the
10 officer was there?
11     A. Yeah, I had to finish, yes.
12     Q. How often do you work on payroll? What
13 days of the week do you work on payroll?
14     A. Every other Monday, Tuesday.
15     Q. Do you recall what day of the week this
16 incident happened on the 15th?
17     A. I don't recall the actual day, no.
18     Q. But according to your testimony, it
19 would have to be a Monday or Tuesday, since you
20 needed to finish the payroll?
21     A. Possibly. It could be Monday, Tuesday
22 or Wednesday. It depends on how far I get.
23     Q. Were you prevented from moving about
24 the office by any of the officers?
25     A. No.

Page 29

1      Q. Did you feel threatened by -- let's
2  start with that one officer.
3          Were you threatened by that one officer
4  while the two of you were there?
5      A. No.
6      Q. Did he detain you in any way?
7          Could you have left the office if you
8  wanted to?
9      A. I never tried.
10     Q. Did he prevent you or tell you that he
11 was going to stop you from leaving the office?
12     A. No. He just said -- he said that he
13 was going to stay with me until they found
14 Mansour.
15     Q. But from that, did you -- was it your
16 understanding that you could not leave the
17 office?
18     A. Yes, because he was there with me.
19     Q. Did you ask him to leave?
20     A. No.
21     Q. Did you leave the office at all for any
22 reason?
23     A. No.
24     Q. Did you need to leave the office for
25 any reason?

Page 30

1    A. No.
2    Q. During this entire time, you never
3 asked anybody what was happening or what was
4 going on, why all this was happening?
5    A. No, I did not.
6    Q. Why not?
7    A. I didn't know what was going on.
8    Q. Did you ask to call anyone? Did you
9 ask to call the police or did you ask to call a
10 lawyer?
11    A. No.
12    Q. Did you ask to call anybody to see what
13 might be going on?
14    A. No.
15    Q. Did you seek to contact Mr. Arekat?
16    A. No.
17    Q. Why not?
18    A. Because the officer was there.
19    Q. Did he prevent you from calling
20 anybody?
21    A. No.
22    Q. In your chain of command, who do you
23 report to?
24    A. Mansour.
25    Q. Are there any other layers in between

Page 31

1 you and Mr. Arekat?
2    A. Chris, operations manager.
3    Q. Did you attempt to call Chris?
4    A. No.
5    Q. How do you communicate with
6 Mr. Arekat?
7       Does he have a cell phone?
8    A. Yes.
9    Q. In December of 2003, what number would
10 you call him at in order to reach him if he was
11 out?
12    A. It would be his cell phone.
13    Q. What number would you have to call to
14 reach him?
15    A. If I was to call him, it would be his
16 cell phone: 221-7711.
17    Q. And do you know which carrier, which
18 cell phone carrier, that the cell phone is with?
19    A. I don't recall.
20    Q. Do you handle the payables and
21 receivables for API?
22    A. A portion of it, yes.
23    Q. Which cell phone do -- the cell phones
24 that API used back in December of '03 was which
25 company?

Page 32

1    A. At the time, I'm not sure. It could
2 have been either T-Mobile or Verizon.
3    Q. Does the company provide cell phones to
4 the employees?
5    A. Not to the -- to the sites.
6    Q. To the various places --
7    A. To the sites, yes.
8    Q. -- that are provided with security?
9    A. Yes.
10    Q. Did you have a cell phone from the
11 company?
12    A. No.
13    Q. Did Mr. Dallesio have a cell phone from
14 the company?
15    A. I believe he did at the time.
16    Q. What was Mr. Dallesio's cell phone
17 number back in December of 2003?
18    A. I don't recall the number right now.
19    Q. It would also be under the T-Mobile or
20 Verizon account?
21    A. Correct.
22    Q. Did you attempt to call Mr. Dallesio at
23 all after the police arrived?
24    A. No.
25    Q. Why not?

Page 33

1    A. I had no reason to.
2    Q. Had the police ever come to the API
3 premises before this incident?
4    A. No.
5    Q. In your mind, when the police came to
6 the premises, did you have any thoughts as to why
7 it is that they might be there?
8    A. I had no idea why they were there or
9 why they would show up there, no.
10    Q. Was there anything going on in the
11 operations of API or with Mr. Arekat which you
12 think might have been the reason they came?
13    A. No idea.
14    Q. To this day, do you have any idea why
15 it is that the police came to the API premises
16 that day?
17    A. No.
18    Q. You said that you met with Mr. Seitz
19 before the deposition today. Is that right?
20    A. Today, yes.
21    Q. How many times have you met with
22 Mr. Seitz?
23    A. Today was the first time.
24    Q. Have you had any telephone
25 conversations with him before?

Page 34

1    A. No.
2    Q. Have you had any telephone
3 conversations or meetings with anybody from his
4 office other than Mr. Seitz?
5    A. No.
6    Q. How long did the meeting with
7 Mr. Seitz take place?
8    A. Five minutes.
9    Q. And you discussed basically what was
10 going to happen at today's deposition?
11    A. Correct.
12    Q. Did you talk with Mr. Arekat before
13 today's deposition about this deposition?
14    A. No.
15    Q. Did you talk with anybody else about
16 this deposition before the deposition?
17    A. No.
18    Q. How long -- who's responsible for
19 maintaining the videotape or the cameras for the
20 surveillance of the API premises?
21    A. Probably Mansour.
22    Q. Are you involved at all in that
23 process?
24    A. No.
25    Q. Do you know what the purge period is

Page 35

1 for the videotapes for the surveillance of the
2 premises of API?
3    A. No, I do not.
4    Q. Did you handle that videotape at all
5 for December 15, 2003?
6    A. No.
7    Q. Are there more than one videotapes for
8 December 15th, 2003 that you're aware of?
9    A. No idea.
10    Q. Do you know whether or not -- you said
11 there were at least two cameras that you're aware
12 of that survey the premises. Is that right?
13    A. Yes.
14    Q. Do you know if there is a separate
15 video produced by each camera?
16    A. I wouldn't know.
17    Q. But you're confident that that initial
18 door opening where you testified to earlier was
19 actually on the videotape that you saw?
20    A. Yes.
21    Q. Mr. Seitz asked you about your Exhibit
22 1, the August 18th, 2004 statement.
23    You said you volunteered to write it.
24 His question to you was, why did you write it or
25 did anybody ask you to write it.

Page 36

1    Did anybody ask you for a written
2 statement?
3    A. No.
4    Q. Why in August of 2004, almost a year
5 after the incident, is it that you wanted to
6 write a statement about what happened?
7    A. To make sure I didn't forget the event
8 and that there is a pending review, I guess, of
9 this case.
10    Q. What review was pending at that time?
11    A. I know there was a lady Marla who was
12 also involved, Marla Panglan. I can't pronounce
13 her last name.
14    Q. Who is Marla Panglan?
15    A. She worked in the office, also.
16    Q. What was her position?
17    A. Personnel manager, scheduler. She was
18 a scheduler.
19    Q. Who did she report to?
20    A. Mansour.
21    Q. Did you supervise Ms. Panglan at all?
22    A. It was co-equal.
23    Q. Do you know where she was that day of
24 the incident?
25    A. No.

Page 37

1    Q. Did you speak with any attorneys that
2 represented Ms. Panglan?
3    A. No.
4    Q. So no attorney asked you to write a
5 written statement?
6    A. No.
7    Q. Did Mr. Arekat ask you to write this
8 written statement?
9    A. Yes. I would say yes.
10    Q. Did you write anything down closer in
11 time to the incident, like in December of 2003?
12    Did you make any notes, make any
13 handwritten notes, of what happened on the day of
14 the incident?
15    A. No, I did not.
16    Q. Why not?
17    A. I wanted to get it behind me.
18    Q. So what did you use to draft this
19 statement of August 18, 2004?
20    A. My recollection of the event.
21    Q. And you didn't go back and review the
22 videotape before you signed this --
23    A. This, no.
24    Q. -- statement?
25    A. No. No, I did not.

Page 38

1 Q. Where is it that you typed -- did you
2 type this document?
3 A. Yes.
4 Q. And where was it typed?
5 A. In the office.
6 Q. Is that an office computer?
7 A. Yes.
8 Q. Did you let Mr. Arekat see this?
9 A. Yes, for his file.
10 Q. Was it actually printed out of the
11 computer at the API offices?
12 A. Yes.
13 Q. And then when did Mr. Arekat first see
14 this?
15 A. The day it was requested to do a
16 statement and I volunteered to do it.
17 Q. Did he tell you why it was that he was
18 requesting a statement?
19 A. Not exactly, no.
20 Q. And did he see it on the computer or in
21 printed form first?
22 A. When I was done.
23 Q. So you gave it to him?
24 A. After it was done.
25 Q. And you had already signed it?

Page 39

1 A. Yes.
2 Q. And dated it?
3 A. Yes.
4 Q. Did he review it at that time?
5 A. I don't know.
6 Q. Did he make any comments to you about
7 your statement?
8 A. No, he did not.
9 Q. You testified that when the officers
10 came and knocked on the door, that the door was
11 locked.
12 A. Yes.
13 Q. Is that standard business practice for
14 API to lock its doors during normal business
15 hours?
16 A. After hours.
17 Q. This was after hours?
18 A. Yes.
19 Q. What time did the door get locked?
20 A. Approximately four o'clock.
21 Q. And you were there because you
22 generally started later in the afternoon?
23 A. Yes.
24 Q. What time would you generally finish?
25 A. It could be anywhere between six to

Page 40

1 nine p.m.
2 Q. But during regular business hours, the
3 door is not locked, is that right?
4 A. Correct.
5 Q. Who locked the door that evening?
6 A. That would have been me.
7 Q. Now, when the officers did knock on the
8 door, was there a way to see who was at the door,
9 like a peephole that you could see who was at the
10 door?
11 A. No.
12 Q. So you opened it just a little bit to
13 see who it was first?
14 A. Correct.
15 Q. When you saw these heavily armed
16 individuals, is it your testimony that you did
17 not want them to enter?
18 A. Basically, when I opened the door, he
19 asked me where Mansour was, and the rest came in,
20 so I didn't get a chance to even say anything.
21 Q. Did you think that it was wrong for
22 them to enter the premises the way that they
23 did?
24 A. I really don't know because I never
25 experienced police officers being heavily armed

Page 41

1 like that. So I -- basically, I was just
2 frozen. I keep saying stunned. So I didn't have
3 any reaction.
4 Q. So you weren't attempting to refuse
5 their entry, is that right?
6 A. Well, I was standing in front of the
7 door, and, like I had said, I didn't have time
8 because while he was asking me where Mansour was,
9 the others rushed in.
10 Q. But you weren't trying by your body
11 language or anything else to say no, this is not
12 right, stay out, I'm refusing you entry?
13 A. Not with guns.
14 Q. Did you at any time while you were
15 there after they came in say what are you doing
16 here, this is wrong, please leave, anything like
17 that?
18 A. No.
19 Q. Was it in your mind at that time that
20 what they were doing is wrong?
21 A. I really didn't have any thought. All
22 I seen was the guns. I was nervous, I was afraid
23 and I had no reaction except to be -- I just
24 hoped nothing happens while I'm there.
25 Q. Are you familiar with a former employee

Page 42

1 named David Engle?
2    A. Just as an employee, worker.
3    Q. How is it that you are familiar with
4 Mr. Engle?
5    A. I processed his paperwork and put it in
6 the computer and put his folder together.
7    Q. Are you aware that Mr. Engle is no
8 longer associated with API?
9    A. Yes.
10    Q. And how is it that you're aware of
11 that?
12    A. He violated one of our policies, and he
13 was terminated.
14    Q. What policy did he violate?
15    A. Theft, robbery.
16    Q. Were you involved at all in the
17 decision on whether to terminate Mr. Engle?
18    A. No.
19    Q. How is it that you came to know about
20 him being terminated?
21    A. I had to input the data in the computer
22 and remove his record from the active to the
23 inactive file.
24    Q. Who provided you with the information
25 regarding the termination?

Page 43

1    A. The information comes to my desk, and I
2 act on it.
3    Q. Do you have any independent knowledge
4 of whether or not the violation actually
5 occurred, whether or not he actually was guilty
6 of theft and robbery?
7    A. No idea.
8    Q. Did you personally have any problems
9 with Mr. Engle?
10    A. I just knew he was an employee, a
11 worker. That's it.
12    Q. So in terms of his credibility and
13 whether he tells the truth or doesn't tell the
14 truth, do you have any opinion?
15    A. I have no opinion.
16    Q. Were you aware of any incidents where
17 Mr. Engle came to the premises requesting his
18 paycheck?
19    A. I believe he may have came. I'm not
20 sure. I can't recall.
21    Q. Were you present at API when Mr. Engle
22 came to the premises requesting his paycheck?
23    A. I'm not sure.
24    Q. Were you present at all when
25 Mr. Engle's representative or his wife came to

Page 44

1 the premises to request his paycheck?
2    A. I'm not sure.
3    Q. Do you recall any situation where
4 Mr. Engle or anyone was requesting his paycheck?
5    A. I believe someone was requesting for
6 his paycheck. I'm not sure who it was. I don't
7 recall.
8    Q. What is the way or the method that API
9 generally pays its employees? In the mail? Or
10 do they give checks directly to the employees?
11    A. They have to pick it up.
12    Q. Did you witness any interaction between
13 Mr. Arekat and Mr. Engle at the office of API
14 during any one of those situations where the
15 paychecks were at issue?
16    A. I don't -- no, I don't recall any
17 interaction between Mansour and Mr. Engle. No, I
18 don't recall.
19    Q. Did you ever see any arguments or any
20 heated discussions between Mr. Arekat and
21 Mr. Engle at the premises?
22    A. No.
23    Q. Did you ever see any physical
24 interaction between Mr. Arekat and Mr. Engle at
25 the API premises?

Page 45

1    A. No.
2    Q. Other than cell phone communication, if
3 you needed to get ahold or get in touch with
4 Mr. Arekat, besides cell phone, are there any
5 other forms of communication that you could use
6 to reach Mr. Arekat or Mr. Dallesio?
7    A. No. Just the cell phone.
8    Q. So back in December, if you had needed
9 to reach him on a rush basis, it would have been
10 through the cell phone?
11    A. Yes.
12    Q. You didn't have walkie-talkies or
13 Nextels, something where without dialing you
14 could just press a button and be in touch with
15 them?
16    A. No.
17    Q. How about e-mail or text messaging,
18 could you get ahold of him that way in December
19 of 2003?
20    A. No.
21    Q. Does Mr. Arekat have an e-mail
22 address -- or did he have one in December of
23 2003?
24    A. Yes, I think.
25    Q. Do you recall what his e-mail address

Page 46

1 was?
2    A. The company mail:  Security at API
3 Security dot net -- Security Inc. -- Security
4 at API Security Inc dot net.
5    Q. I'm sorry we're going to have to do
6 that again.
7       In December of 2003, what was
8 Mr. Arekat's e-mail address?
9    A. Security at API Security Inc dot net.
10    Q. To your knowledge, has that e-mail
11 address changed from then until the present date?
12    A. Not that I'm aware of.
13    Q. Are you aware of any other identifiers,
14 screen names or other identifiers that Mr. Arekat
15 has for communication via the computer?
16    A. I'm not aware of any others.
17       MR. HOSODA: Thank you.
18          EXAMINATION
19 BY MR. DANDAR.
20    Q. Mr. Dixon, my name is Jim Dandar, and I
21 represent one of the police officers.
22       Let me ask you some questions that are
23 attempting to fill in the blanks.  I'll jump
24 around in terms of topics.
25       But if I ask you any question that you

Page 47

1 don't fully and completely understand, just ask
2 me to repeat it and rephrase it until such time
3 as you do, and I'll be happy to do that.
4       Do you understand that?
5    A. Yes.
6    Q. With respect to Mr. Engle, what is the
7 policy of API with respect to the paychecks?  Are
8 they paid on a particular day?
9    A. Yes.
10    Q. What day?
11    A. Payday is available Friday, the first
12 Friday, the end of the pay period.
13    Q. When do the pay periods run?  Are they
14 weekly, biweekly?
15    A. Biweekly.
16    Q. So would that be sort of like every two
17 weeks on the Fridays --
18    A. Yes.
19    Q. -- your check is available for the
20 employee?
21    A. It should be there Friday.
22    Q. And so it's not necessarily twice a
23 month; if a particular month were to have such a
24 situation, you could get paid three times per
25 month if the situation presented itself,

Page 48

1 correct?
2    A. Yes.
3    Q. Now, you said Mr. Engle at some point
4 in time was terminated because he violated a
5 company policy, correct?
6    A. Yes.
7    Q. Was he terminated before or after
8 December 15th, 2003, if you can recall?
9    A. I can't recall.
10    Q. If an employee is terminated before the
11 two-week period runs, is there a policy or
12 procedure of API Security concerning how that
13 employee received their paycheck?
14    A. Yeah.  If they're terminated before the
15 pay period ends, they get paid within a
16 twenty-four-hour period.
17    Q. Of their termination?
18    A. Yes.
19    Q. As far as you know, who was the person
20 who informs an employee of their termination?  Is
21 it Mr. Arekat, Mr. Dallesio or other people?
22    A. Possibly Mr. Arekat or Mr. Dallesio.
23 I'm not sure.  I wasn't part of that operation.
24    Q. You don't know of anybody other than
25 Mr. Arekat or Mr. Dallesio who would have the

Page 49

1 authority to terminate an employee?
2    A. There are supervisors that will submit
3 paperwork which will be reviewed by the office,
4 who will make a final decision.
5    Q. So you're the final decision,
6 the actual decision to terminate --
7    A. From what --
8    Q. Excuse me.  Let me finish my question
9 so we have a clean record.
10       The actual decision to terminate an API
11 Security employee is made either by Mr. Arekat or
12 Mr. Dallesio?
13    A. From what I understand, yes.
14    Q. Are there personnel manuals or
15 procedure manuals concerning personnel matters
16 for API that are in a written form?
17    A. Our training policy.
18    Q. Is there -- are there any manuals or
19 policy manuals other than the training policy
20 manual that you know of?
21    A. Not that I'm aware of.
22    Q. And this policy that you speak of of
23 terminated employees receiving their pay within
24 twenty-four hours of the date and time of their
25 termination, is that written down someplace?

Page 50

1    A. It's on a poster.
2    Q. And this is a poster that's displayed
3 in the API Security office?
4    A. Correct.
5    Q. Is that part of the training manual
6 that's provided to employees, that information
7 about their paycheck within twenty-four hours
8 after the date of termination?
9    A. It's not in the policy, no.
10    Q. This poster that you spoke of, is it
11 prominently displayed in the API Security
12 offices?
13    A. Yes, it is.
14    Q. Is there any other information
15 contained on this poster other than that you will
16 be paid -- paraphrasing, of course -- that you
17 will be paid within twenty-four hours of your
18 date of termination?
19    A. No. Actually, I think the poster says
20 within the next business day, is what the poster,
21 I believe, says.
22    Q. Is there any other information
23 concerning that other than that the next business
24 day you'll be paid?
25    A. Not that I'm aware of.

Page 51

1    Q. Can you describe this poster for me?
2 Is it an eight-and-a-half-by-eleven piece of
3 paper like this? Is it larger? Is it smaller?
4    A. It's much larger.
5    Q. You have some pictures behind you, some
6 paintings. Is it approximately the size of
7 those?
8    A. About half the size [Indicating.]
9    Q. About half the size of the middle one?
10    A. Yeah.
11    Q. What would you say that is? And you're
12 bisecting it vertically, right?
13    So it's maybe about two and a half,
14 three feet wide by maybe two feet high?
15    A. I'm not sure of the exact dimensions.
16    Q. Would you say that's approximately the
17 size of that painting --
18    A. Yes.
19    Q. -- if you bisected it on the equator?
20    A. Yeah, that would be my guess.
21    Q. Is there any other information on it
22 other than you will be paid within the next
23 business day?
24    That's an awful big piece of paper for
25 just that little bit of information.

Page 52

1    Is there anything else on it?
2    A. There's employment information that's
3 required by law to be posted, and I can't go
4 through everything that's on there. That's a lot
5 of stuff.
6    Q. Are you still -- I came in late. I'm
7 sorry. Are you still employed by API Security?
8    A. Yes.
9    Q. When were you last at the office?
10    A. Yesterday.
11    Q. And was it there at the office, that
12 poster, yesterday?
13    A. Yes.
14    Q. Now, did you ever see or have occasion
15 to see Mr. Engle and Mr. Arekat in the API
16 offices at any time together?
17    A. [No audible response.]
18    Q. In other words, both individuals were
19 in the office at the same time?
20    A. I really -- I don't recall.
21    Q. Do you ever recall an occasion where a
22 representative of Mr. Engle, such as his wife,
23 and Mr. Arekat were physically located in the API
24 offices at the same time?
25    A. I don't recall.

Page 53

1    Q. Now, you mentioned -- changing subjects
2 somewhat. You also mentioned that there are at
3 least two security cameras in the API offices.
4 Correct?
5    A. Yes.
6    Q. Now, that means that there may be more,
7 but you're just not sure?
8    A. I'm not sure.
9    Q. The security camera that is located
10 approximately by the front door, in the vicinity
11 of the front door, that's one of the security
12 cameras, correct?
13    A. Yes.
14    Q. Where would the second camera be
15 located that you are aware of?
16    A. In the back room where the computers
17 are, the main server.
18    Q. I don't know if anybody has asked you
19 to draw a layout or a schematic of the API
20 offices. I'd like to take a break at this time
21 and ask you to basically draw a floor plan.
22    And since we've been going about an
23 hour, maybe we can take a short recess while
24 you're doing that.
25    (Recess taken.)

Page 54

1    MR. DANDAR:  Back on the record.
2    Q. BY MR. DANDAR:  Mr. Dixon, while we
3  were on a short recess, you kindly drew a floor
4  plan of the API Security offices as you can
5  recall them appearing in December of 2003.
6  Correct?
7    A. Yes.
8    Q. I understand there have been some
9  changes or modifications to this floor plan that
10  you drew representing the situation at the office
11  in December, 2003; and that would be basically as
12  to this conference room which is on the extreme
13  left side of the drawing, correct?
14    A. Yes.
15    Q. And that is now other office space,
16  correct?
17    A. Yes.
18    Q. And, in fact, you wrote in "other
19  office space" at my instructions; but upon
20  further clarification, you scratched that out and
21  you put in "conference room," correct?
22    A. Yes.
23    Q. Is it fair to say that all of the
24  writings, as well as all the drawing that is
25  contained on this piece of paper, is yours?

Page 55

1    A. Yes.
2    Q. Would you sign it and date it down here
3  in the lower left-hand corner.
4    A. [Writing.]
5    Q. We'll have this marked as Exhibit 2 to
6  your deposition.
7    Let me just also understand.  You drew
8  two circles that have been darkened or colored
9  in.  Are those to represent where the security
10  cameras were, to the best of your knowledge, in
11  December of 2003?
12    A. Yes.
13    Q. And that would be one which is near --
14  it's sort of on the diagonal of the reception
15  area, right beyond the front -- to the left of
16  the front door as you're entering it and in front
17  of the security counter.  Correct?
18    A. Yes.
19    Q. Then there's another security camera in
20  the server room, correct?
21    A. Yes.
22    Q. And that position is indicated by a
23  circle that's been colored in, correct?
24    A. Yes.
25    MR. TANAKA:  Could you have him just

Page 56

1  maybe write in where the front door is?
2    Q. BY MR. DANDAR:  Would you write in the
3  front door?
4    A. [Writing.]
5    MR. TANAKA:  Thank you.
6    Q. BY MR. DANDAR:  And then with little
7  arrows, can you draw out and just put "camera."
8    A. [Writing.]
9    Q. Now, the front door, does that swing
10  left or right as you open it?
11    A. [Writing.]
12    Q. You don't have to write it in.  You can
13  just tell me.
14    When you open the door, does it swing
15  in?
16    A. It swings in, yes.
17    Q. Does it swing in to the left or to the
18  right as you're facing the door from the inside?
19    A. To the left.
20    Q. You pull it open, and it goes towards
21  your left?
22    A. My left, yes.
23    Q. Okay.  So, in other words, towards the
24  interview room?
25    A. Yes, that's where it swings.

Page 57

1    Q. Now, what kind of locks are on the
2  security door?
3    Again, I'm taking you back to that
4  period of time in December of 2003.
5    A. A five-position lock.
6    Q. I'm sorry.  I don't know what a
7  five-position lock is.
8    A. A five-button lock.  I'm not sure what
9  it's called.
10    Q. So there's a security code that you
11  punch in?
12    Have you been to the rest rooms right
13  outside here?
14    A. No.
15    Q. In other words, you have to put in a
16  sequence of numbers in the right order before it
17  will open?
18    A. Correct.
19    Q. And that's done externally?
20    A. Correct.
21    Q. Is that the only lock on the door?
22    A. I believe at the time that was the only
23  one.
24    Q. Who would know that number, as far as
25  you know, in December of 2003?

Page 58

1    A. All the staff personnel.
2    Q. Staff personnel; that would not include
3 the security guards, would it?
4    A. No.
5    Q. Would that include Mr. Arekat?
6    A. Yes.
7    Q. Would that include Mr. Dallesio?
8    A. Yes.
9    Q. Would that include yourself?
10    A. Yes.
11    Q. Ms. Panglan?
12    A. Yes.
13    Q. Anybody else?
14    A. I believe that's all that was in the
15 office at the time.
16    Q. Those were the only people who would
17 have access to the main office in December of
18 2003?
19    A. Yes.
20    Q. How about the supervisors that you
21 spoke of?
22    A. [No audible response.]
23    Q. You know, security supervisors.
24    A. I believe at the time, they may have
25 had access before we made changes. So I believe

Page 59

1 at the time, they had access, also, supervisors.
2    Q. But there has been a subsequent change,
3 and they do not have access?
4    A. Correct.
5    Q. Was the number or the code or the
6 sequence of numbers that needed to be punched
7 into the lock changed at any time, as far as you
8 know?
9    A. After that event?
10    Q. Before the event of December, 2003, and
11 then I'll ask you after.
12    A. I'm not sure. But I change it
13 periodically. So I'm not sure of the question
14 you're asking me.
15    Q. You're the person who changes the
16 sequence?
17    A. I'm the one that does the change, yes.
18    Q. When you make the change, you notify
19 these other three people of the change, correct?
20    A. Everyone that needs access to the
21 office, I give them the codes.
22    Q. And that would have been the three
23 people that we mentioned: Mr. Arekat,
24 Mr. Dallesio, Ms. Panglan and perhaps
25 supervisors?

Page 60

1    A. Yes.
2    Q. How many supervisors were there?
3    A. At the time, I'm not sure. Probably at
4 least three, four. I'm not sure of the exact
5 numbers.
6    Q. And did you change the code to gain
7 access to the office on a periodic basis or just
8 on a random basis?
9    A. Upon a periodic basis and upon leaving
10 of any supervisor or anyone that knew the
11 combination, it was immediately changed.
12    Q. Did Mr. Arekat ever request that you
13 change the code for some reason other than you
14 just mentioned?
15    A. No. I'm the one that does the actual
16 changing.
17    Q. At no time, as far as you can recall,
18 did Mr. Arekat ever ask you to change the code?
19    A. Not that I can recall, no.
20    Q. Did Mr. Dallesio ever ask you to change
21 the code?
22    A. Not that I can recall now.
23    Q. And Ms. Panglan?
24    A. No.
25    Q. So, basically, it's your testimony that

Page 61

1 the only time that the code to gain access to the
2 office was changed was when a person who may have
3 had access to that code information left the
4 business?
5    A. Uh-huh, correct.
6    Q. So let me take you to December 15th,
7 2003 at approximately 1700 hours, which is five
8 o'clock. Correct?
9    A. Yes.
10    Q. Your normal business hours were from
11 nine to four, correct, for API?
12    A. Yes, the office hours, yes.
13    Q. So at 1700, that would be one hour
14 after the normal and usual closing time,
15 correct?
16    A. Yes.
17    Q. And anybody who would want to have
18 access to the API Security offices after the
19 close of business hours would have to have that
20 code, correct?
21    A. Correct.
22    Q. Now, how is it that you actually
23 activate that security system?
24    I mean, during the normal business
25 hours, I get the impression that people can

Page 62

1 freely come into and out of the office. Correct?
2    A. Correct.
3    Q. What happens at approximately four
4 o'clock such that the code is then necessary to
5 open the front door?
6    A. During working hours, there is a rubber
7 stopper that prevents the door from shutting.
8 And at the end of business hours, that rubber
9 stopper is removed, and the door automatically
10 shuts.
11    Q. Describe to me the substance of the
12 door. Was it a metal door, a wooden door, a
13 solid wooden door, back in 2003? We're all
14 focusing on that period of time.
15    A. It's a very heavy wooden door, I
16 believe.
17    Q. And it's solid wood like this table
18 that we're sitting in front of?
19    A. I think so.
20    Q. It's not one of those hollow doors
21 where there's a frame and just a veneer on the
22 outside?
23    A. No. It's a very heavy door.
24    Q. As far as you know, prior to December
25 of 2003, had anybody ever broken into the API

Page 63

1 offices?
2    A. Not that I'm aware of, no.
3    Q. Now, what alerted you that somebody was
4 at the front door on December 15th, 2003 at
5 approximately five o'clock?
6    A. There was a knock on the door.
7    Q. In other words, the rubber stopper had
8 been taken away so the door was in a secured
9 position?
10    A. Correct.
11    Q. And the only people who would need to
12 have access to that office at that time, as far
13 as you were concerned, on December 15th, 2003
14 would have been yourself, who was there,
15 correct?
16    A. Yes.
17    Q. Mr. Dallesio, who knew the code number,
18 correct?
19    A. Correct.
20    Q. Mr. Arekat, who knew the code number,
21 correct?
22    A. Correct.
23    Q. And Ms. Panglan, who knew the code
24 number, correct?
25    A. Correct.

Page 64

1    Q. So when you responded to the knock at
2 the door, did you ask who's there?
3    A. No, I did not.
4    Q. Why not?
5    A. Because I always get knocks on the
6 door. Sometimes guards who are required or
7 called to meet the supervisor at night will
8 sometimes come up and not wait in the parking
9 lot, but come up to the office and knock on the
10 door.
11    Q. But wouldn't you necessarily ask them
12 who this was, who was there?
13    A. No. Five o'clock in the evening, I had
14 no concern that it was any -- any problem.
15    Q. Now, you said you opened the door a
16 little bit, right, or partially opened it?
17    A. Yeah, partially opened it, yes.
18    Q. If you weren't concerned about who was
19 on the other side of the door, why did you only
20 open it partially?
21    A. Standard -- it's the standard, you
22 know, way of opening a door. For me, it's common
23 sense. I just open it partially until you know
24 for sure who's out there.
25    Q. What do you mean by "partially"?

Page 65

1       How much space was there when you
2 opened the door between the jamb and the door?
3    A. I don't know exactly. Just open it far
4 enough to see who's on the other side.
5    Q. We have a glass door here that swings
6 open to the left. I'm going to stand here as you
7 would have been standing. Correct?
8       You would have been behind the door
9 because there's no place else for you to stand if
10 you have a left swinging open door, correct, from
11 that diagram?
12    A. Correct.
13    Q. Did you open it this much?
14    A. No. Probably a little bit more than
15 that.
16    Q. This much?
17    A. Yes. But I was standing in front.
18    Q. So you stood over here, then?
19    A. Yes.
20    Q. Okay. Why would you only open it
21 partially if you were not concerned who was on
22 the other side?
23    A. [No audible response.]
24    Q. You understand what I'm saying?
25    A. [Nodding head.]

Page 66

1    Q. If you're standing here and you're
2 going to open the door, you're just going to open
3 it like this so it's almost wide open, right?
4 Wouldn't that be the normal way people open a
5 door?
6    A. Not for me, it's not.
7    Q. So you always open a door
8 approximately -- what is that?  Maybe --
9    A. Shoulder width, approximately.
10    Q. Shoulder width, so that somebody can
11 walk through?
12    A. No, because I'm standing there.
13    Q. But are you behind the door partially
14 like this or over completely on the side?
15    A. On the side so it won't hit my left
16 foot.
17    Q. But it wouldn't hit your left foot.
18    A. I'm standing off to the right so it
19 would not hit my left foot.
20    Q. Okay.  Now, what kind of hardware was
21 on the door in 2003?
22    A. The hardware, as far as...
23    Q. Knobs, handles.
24       How was the door opened from the
25 inside?

Page 67

1    A. You got two knobs.
2    Q. Two knobs?
3    A. Two doorknobs.
4    Q. Why are there two doorknobs?
5    A. You've got the doorknob that comes with
6 the door, and then there's an installed security
7 doorknob.
8    Q. That's the coded one?
9    A. Yes, that's the coded one.
10    Q. Now, the knob that came with the door,
11 was that also a secured door?  Did it have like a
12 locking system on it?
13    A. Yes.
14    Q. How was it done?  Was it by pushing a
15 button or twisting?
16    A. Twisting.
17    Q. So you had to undo that when you opened
18 the door?
19    A. You had to turn both knobs to open the
20 door, yes.
21    Q. If you had to turn both knobs, you
22 couldn't have been off to the left-hand side,
23 sir, because it would take two hands to open both
24 knobs.  So you would have to be in front of the
25 knobs or behind the door, wouldn't you say?

Page 68

1    A. Yeah.  After you turn the two knobs,
2 then you step aside and pull the door open.
3    Q. So the process that you went by --
4 let's say there's a knock on the door.  You come
5 up, you unsecure the knob and locking system that
6 came with the door, correct?  And then you take
7 the other handle for the secured system that you
8 put in that has the code.  You'd twist both knobs
9 to open it, and then you move over to the left-
10 hand side and you open the door?  Is that what
11 you're saying happened?
12    A. Can I demonstrate?
13    Q. Sure.  Please.
14    A. There's a doorknob approximately here,
15 a doorknob approximately right here [Indicating.]
16    Q. Which one is the secured one?
17    A. The top upper one.
18    Q. That's the one that needs a code?
19    A. It needs a code.
20    Q. And that's approximately a little bit
21 above your waistline?
22    A. I'd say about approximately here
23 [Indicating.]
24    Q. That's above your waistline, isn't it?
25    A. Yes.

Page 69

1    Q. And the lower one, which is the knob
2 that came with the door, is approximately a
3 little bit below your waistline, corrrect?
4    A. Yes.
5    Q. Okay.
6    A. So you turn both the knobs and then
7 pull open the door partially, step to the side,
8 open as such.  And this is approximately how I
9 was standing when the door was opened and I seen
10 the officers [Demonstrating.]
11    Q. Okay.  Did they say anything to you?
12    A. "Where is Mansour?"
13    Q. They didn't --
14    A. "Have you seen Mansour?"
15       And I said, "No."
16       And then the others rushed in.
17    Q. And you didn't hear them identify --
18 did you ever hear them identify themselves as
19 police?
20    A. I don't recall.  They may have.  I
21 don't recall.
22    Q. And you said you were somewhat stunned
23 because you hadn't been around guns?  Is that
24 what you're saying?
25    A. Yes.

Page 70

1    Q. And that they were heavily armed.
2        And because they were heavily armed,
3 you were stunned and part -- what caused you to
4 be stunned? Was it the fact that they were
5 heavily armed or there were so many of them or a
6 combination of both?
7    A. Combination of both. Many of them, and
8 they had guns.
9    Q. Plus, they had all this equipment, you
10 said?
11    A. Correct.
12    Q. You had been in the military for
13 twenty-three years?
14    A. Yes.
15    Q. What branch?
16    A. Navy.
17    Q. And you'd never been around guns in
18 that twenty-three years that you were in the
19 military?
20    A. On the ship, we have a sentry that
21 stands at the -- that will let you on and off
22 the ship, and that's a little hand pistol. And
23 that's it.
24    Q. During basic training, you don't get
25 any training with rifles or pistols or guns or

Page 71

1 firearms?
2    A. No.
3    Q. Now, when you said they pushed their
4 way in, were you saying don't come in? Were you
5 trying to deny them? Did you try to hold on to
6 the doorknob such that they couldn't access?
7        MR. KAWASAKI: Asked and answer.
8    Go ahead.
9        THE WITNESS: Not when they're armed
10 with guns. I didn't know what to do except just
11 stand there.
12    Q. BY MR. DANDAR: Now, you described it
13 as they forced -- how did you describe it?
14        Well, I don't think you describe it in
15 your statement. And I might have missed your
16 testimony.
17        Did you say that they shoved their way
18 in, pushed their way in?
19    A. Pushed.
20    Q. Pushed. And that means that somebody
21 actually leaned up against the door and shoved it
22 in?
23    A. Correct.
24    Q. Who would that have been? The first
25 person?

Page 72

1    A. The first person was talking to me, so
2 it was the person after him.
3    Q. And how were they aligned outside
4 the -- on the other side, the outside part of
5 the door?
6    A. In a group all massed together.
7    Q. When you say "a group," are we talking
8 about like a muddle-huddle type of situation?
9    A. Yes.
10    Q. And the person who was talking to you
11 wasn't the person who pushed it open?
12    A. No.
13    Q. It was somebody behind him?
14    A. Yes.
15    Q. Now, again, let's kind of look at this
16 door. Was this about the size of the door?
17    A. Approximately, yes.
18    Q. The width of it?
19    A. Yes.
20    Q. So, fortunately, we have a glass door
21 so you can see me on the other side of the door.
22        You're standing there, and the door is
23 open like this.
24        Is this approximately the position of
25 the person who is speaking to you?

Page 73

1    A. Approximately, yes.
2    Q. I don't see how anybody could have
3 pushed the door open if I'm standing in this
4 position.
5        MR. KAWASAKI: Is that a question?
6        MR. DANDAR: Yeah, it was a question.
7    Q. BY MR. DANDAR: Can you tell me how a
8 person can push other than myself push this door
9 open standing in this position I'm in?
10    A. They can come to the side.
11    Q. Okay. Well, can you kind of --
12    A. So then they came in, and I didn't open
13 the door for them.
14    Q. You did open the door, though.
15    A. I opened the door partially. But the
16 door was pushed the rest of the way by the
17 other individuals to get in.
18    Q. And you never told them that they
19 couldn't come into the office, did you?
20    A. No, I did not.
21    Q. So you never attempted to deny them
22 access to the office?
23    A. Not when they have their guns.
24    Q. So --
25    A. Not when they're with their guns.

Page 74

1    Q. It's not like you never said you
2  couldn't have access.  You opened the door.
3       Before you opened the door, you had to
4  unlock some security devices.
5       And before that, there was a knock, but
6  you never asked who was on the other side of the
7  door.  Correct?
8    A. Correct.
9    Q. Now, according to the policy and
10  procedures that you were describing, at least as
11  I would understand it, if there is any reason for
12  a security guard to meet a supervisor at the
13  office after hours, he should have waited
14  downstairs in the parking lot for the supervisor
15  and then come up with the supervisor.  Correct?
16    A. If they're informed properly.
17    Q. But they were not to be admitted into
18  the office until they were with the supervisor,
19  correct?
20    A. No.
21    Q. They could be admitted into the office
22  without a supervisor?
23    A. If I'm there, yes.
24    Q. Now, let's turn to this statement, the
25  statement of August 18th, 2004.

Page 75

1       Now, I heard you say that Mansour
2  Arekat requested this statement.  Is that
3  correct?
4    A. He requested it, and it was a voluntary
5  basis, so I volunteered to it.
6    Q. But it was at his request that this
7  statement was done?
8    A. Okay.
9    Q. Is that correct?
10    A. Yes.
11    Q. Is this the first and only draft of the
12  statement?
13    A. The first and only one that I gave to
14  Mansour, yes.
15    Q. There were other drafts that you did
16  not give to Mansour, correct?
17    A. No.  That was the only one.
18    Q. I'm sorry.  I was confused by your
19  answer.  I asked if this was the first and only
20  draft of your statement letter, and you said that
21  was the first and only one given to Mansour.
22       By that, I kind of understood that
23  there may have been other drafts that were not
24  presented to Mr. Arekat.
25    A. No.

Page 76

1    Q. So this is the first and only?
2    A. The one that was given to Mansour, yes.
3    Q. So he requested it on August 18th,
4  2004?
5    A. [Nodding head.]
6    Q. Is that correct?
7    A. On a voluntary basis, yes.
8    Q. I understand you did it on a voluntary
9  basis.  You made that point clear.
10       I'm trying to find out what date he
11  requested you prepare a written statement.  Was
12  it August 18th, 2004?
13    A. It possibly could have been August 18th
14  or the day before.  One of those two days.
15    Q. So no later than -- or no earlier than
16  August 17th?
17    A. Yeah.
18    Q. Or August 18th?
19    A. Yes.
20    Q. How long did it take you to draft this
21  statement?
22    A. Approximately fifteen, twenty minutes.
23    Q. You said you did it at the office?
24    A. Yes.
25    Q. And you did it at a computer at the

Page 77

1  office?
2    A. Yes.
3    Q. Where is the computer located?
4    A. In the back room [Indicating.]
5    Q. Now where the conference room is?
6    A. Yes.
7    Q. I guess where the conference room was?
8    A. Yeah, in the back room.
9    Q. How many computers were back there in
10  December of 2003?
11    A. I believe there is one computer back
12  there.
13    Q. Obviously, that was the computer you
14  used, correct?
15    A. That was the one I used, yes.
16    Q. Do you know if that computer is still
17  in the offices?
18    A. Yes.
19    Q. And how would you describe it?  Is it
20  an IBM computer, a Dell computer, an HP
21  computer?
22    A. I'm not sure.  We have several.  It
23  could have been a Dell.  Possibly a Dell.
24    Q. Why is it that you picked this computer
25  that was in the conference room to use as the

Page 78

1 computer that you would draft this statement for
2 Mr. Arekat?
3     A. That's where I work at, the desk that I
4 use.
5     Q. And since December of 2003, have you
6 changed the computer equipment at API? Not you.
7 But has the computer equipment been changed at
8 API Security?
9     A. We had -- I think so, because we --
10 the computer I was using went bad and had to be
11 repaired two or three times.
12     Q. You have a server room --
13     A. Yes.
14     Q. -- correct?
15         Now, I'm not a -- I'm a computer nerd,
16 so please bear with me.
17         When you typed this statement letter on
18 the computer that's back here in the conference
19 room, did you use the hard drive on it or did you
20 use a floppy to prepare it?
21     A. The hard drive.
22     Q. And the hard drive would be connected
23 with the server?
24     A. Correct.
25     Q. So the information would be stored on

Page 79

1 the server, also?
2     A. No. It just prints -- not the server,
3 but the actual printer is back here, along with
4 the server [Indicating.]
5     Q. So the only place where that
6 information would be contained is on the hard
7 drive of the computer that was back here in the
8 conference room, correct?
9     A. Correct.
10     Q. Since 2003, December of 2003, has there
11 been a change of the hard drive on the computer
12 that's back in the conference room that you use
13 on a daily basis, more or less on a daily basis?
14     A. Yes.
15     Q. When was that change made?
16     A. It was repaired.
17     Q. Do you know if all the information that
18 was on the hard drive before the repair remained
19 upon the hard drive after the repair?
20     A. I'm not sure. But once this letter was
21 done, I erased it. I deleted it after it got
22 printed.
23     Q. Now, while you were typing this letter,
24 was anybody in the conference room area with
25 you?

Page 80

1     A. No. I was alone.
2     Q. Was anybody in the offices of API, as
3 far as you know?
4     A. It was during regular working hours, so
5 it would be your normal staff personnel was
6 there.
7     Q. I understood that you came in after
8 your regular military duties were over.
9         So you were probably there during
10 non-regular work hours, generally speaking,
11 correct?
12     A. Most of the time, after working hours.
13 But a lot of times I get there while the staff
14 was still there.
15     Q. Do you recall on August 18th, 2004
16 whether anybody else was in the offices of API
17 Security when you were typing this statement
18 letter?
19         And I presume you typed it on the 18th
20 of August because that's the day it's dated.
21 Correct?
22     A. Yes, correct.
23     Q. So the question is, do you know if
24 anybody was in the offices of API Security on
25 August 18th, 2004?

Page 81

1     A. Just the staff personnel.
2     Q. And who might that have been?
3     A. At that time, I believe it might have
4 been Marla. I believe Marla. And I'm not sure
5 who else was there because we had -- she's on
6 the front desk, and I'm in the back.
7     Q. Now, August 18th, 2004, let's say you
8 got there at your normal working time, which
9 would have been sometime after four o'clock, and
10 you began typing this. And I might have missed
11 your answer.
12         How long did it take you to type this?
13     A. I don't know. Fifteen, twenty minutes,
14 I believe.
15     Q. And after you finished typing it,
16 obviously, you signed it in the lower left-hand
17 corner and dated it in the lower right-hand
18 corner. Correct?
19     A. [Examining.] Yes.
20     Q. And did you take an opportunity to
21 review it for accuracy before you dated and
22 signed it?
23     A. Yes.
24     Q. What did you do with it then?
25     A. Delivered it to Mansour.

Page 82

```
 1    Q. When you say "delivered it to Mansour,"
 2 how did that take place?
 3    A. I dropped it off on his desk.
 4    Q. Was he in his office?
 5    A. At the time, no.
 6    Q. Had he been in his office earlier that
 7 day when you were in the office?
 8    A. In and out.
 9    Q. So during the time, the twenty minutes,
10 that were you in the office typing this letter,
11 Mansour was in and out of the offices of API
12 Security?
13    A. Correct.
14    Q. Is that usual and customary for him?
15    A. Yes.
16    Q. Is it usual and customary for him to
17 work there beyond the normal working hours of API
18 Security?
19    A. No.
20    Q. So he would normally be gone by the
21 time you arrive at the offices?
22    A. No.  He'd still be there after I
23 arrived.
24    Q. So it was usual and customary for him
25 to work after the normal working hours of API
```

Page 83

```
 1 Security?
 2    A. No, because this wasn't done after
 3 working hours.  This was done during normal
 4 working hours.
 5    Q. Again, I'm confused because I thought
 6 normal working hours were nine to four.
 7 Correct?
 8    A. Correct.
 9    Q. And you said that you weren't sure when
10 you came in on August 18th, 2004.  Correct?
11    A. Yeah, correct.
12    Q. So you don't know if you came in at
13 your usual and customary time, which would have
14 been after four o'clock or before four o'clock,
15 correct?
16    A. Most of the times I come in before four
17 o'clock and stay beyond four.
18    Q. I see.
19    Q. I misunderstood your testimony.
20    A. I arrive usually before the office
21 closes.
22    Q. Now, you used the term "the door was
23 immediately pushed open."
24       Are you saying that once there was a
25 little crack in the doorway, the door was
```

Page 84

```
 1 immediately pushed open?
 2       MR. KAWASAKI:  Asked and answered about
 3 three or four times now.
 4       You can go ahead.
 5    Q. BY MR. DANDAR:  Or did you get it open
 6 to that maybe twelve-inch opening when you spoke
 7 with the person who was at the front of the line
 8 or the front of the muddle-huddle and then it was
 9 pushed open?  Which is it?
10    A. When the door was opened, the person
11 talking to me was asking me where Mansour was.
12 The rest rushed in.
13    Q. So that's about -- was it in that pace
14 of things?
15    A. Yeah.  It happened very quickly.
16    Q. So that was about two to three
17 seconds?
18    A. I don't know exactly.  It happened very
19 quickly.
20    Q. You say you didn't give them permission
21 to enter, but yet at the same time you're saying
22 you didn't tell them that they couldn't enter.
23 Correct?
24       MR. KAWASAKI:  Asked and answered.
25       THE WITNESS:  No.
```

Page 85

```
 1    Q. BY MR. DANDAR:  Now, this search that
 2 you speak of at the end of the first full
 3 paragraph, "I again repeated no!  The thorough
 4 search of the office continued," did they search
 5 this area here by the desk that you have
 6 identified which is in between, I guess -- whose
 7 office is that?
 8    A. [Examining.] That used to be Marla,
 9 where Marla would stay.
10    Q. -- that last office and Mansour's
11 office?
12    A. Yes.
13    Q. They thoroughly searched that desk?
14    A. That's the one I seen them open the
15 drawers.
16    Q. And if there was a thorough search of
17 this desk by individuals, do you believe the
18 security camera that's in the reception area
19 would have picked up that searching?
20       MR. KAWASAKI:  If you know.
21       THE WITNESS:  I don't know.
22    Q. BY MR. DANDAR:  Okay.  Do you know if
23 they searched the rest of the offices?
24    A. I seen them go back this way
25 [Indicating.]
```

Page 86

1  Q. Towards the conference room?
2  A. Yeah. And they went back in the
3 conference room.
4  Q. Did they search the server room area?
5  A. That was -- I'm not sure if that
6 was -- usually, I have it unlocked so they may
7 have gone in there. But I know they went --
8 they went in all the offices. I'm not sure about
9 the server room.
10  Q. But you do recall them specifically
11 searching the desk?
12  A. Oh, yes. That's why I put it in my
13 statement, because I seen them do it.
14  Q. Was it one or more officers who was
15 searching the desk?
16  A. I seen one officer back there.
17  Q. Now, while this search is purportedly
18 going on, did any of the officers speak with you
19 other than what you say here, they asked you if
20 you knew where Mansour was? Did they say
21 anything other than that?
22  A. The one that was with me, he repeatedly
23 kept asking me do I know where he was and am I
24 sure.
25  Q. So all the conversation that you had

Page 87

1 with the officer that was with you was basically
2 where was Mansour, if you knew where he was, if
3 you're sure, that and the other thing?
4  A. Yeah. Do I know where he lives. This
5 is while the search is going on.
6  Q. Now, Chris arrives approximately one
7 hour later. And this is in the second paragraph
8 of your letter.
9  How did Chris gain access to the
10 office?
11  A. He has a code.
12  Q. So he just walked in?
13  A. Yes.
14  Q. Was the officer who was -- when Chris
15 enters the API offices, where was the heavily
16 armed officer who remained on the premises
17 located?
18  A. At the counter.
19  Q. This being the security counter?
20  A. Yes, on this side of the counter
21 [Indicating.]
22  Q. Did he have a weapon drawn?
23  A. He was carrying his weapon.
24  Q. He was carrying his weapon.
25  Let's identify what kind of weapon it

Page 88

1 was. Was it a pistol or was it a rifle-type
2 of --
3  A. Short rifle. Short machine gun-
4 looking. I'm not sure what you call that.
5  Q. Was it being held in his hands?
6  In other words, did he have to hold it
7 in his hands or was it just kind of draped around
8 his body with a strap?
9  A. After everything calmed down, it was
10 draped.
11  Q. And this is sort of like a short rifle,
12 like maybe an Uzi or something like that?
13  A. Yes.
14  Q. But it wasn't a sidearm?
15  A. I didn't see a sidearm being carried.
16  Q. So, again, this is an area where this
17 security camera that's in the reception area
18 would -- do you think it would have shown the
19 officer carrying his machine gun or Uzi-like
20 gun?
21  A. I'm not sure.
22  Q. When you reviewed the surveillance
23 tape, did you see that officer carrying his
24 firearm?
25  A. No. All I saw was the entry point.

Page 89

1 This is all I viewed.
2  Q. So you could not see back here to the
3 desk on the video -- or the surveillance video
4 that you saw?
5  A. What I saw was just the door entry
6 area, this area right here [Indicating.]
7  MR. DANDAR: Off record.
8  (Discussion off the record.)
9  Q. BY MR. DANDAR: With this red pen, can
10 you draw for me a circle around that front door
11 area that you believe was the area that you saw
12 in the surveillance tape?
13  A. [Writing.] Approximately this area
14 here.
15  Q. Okay. It can go beyond the door and
16 the walls?
17  A. Approximately this area here, although
18 I focused on my watching [Indicating.]
19  Q. So from what you're saying, you can't
20 even see the security counter?
21  A. I'm not sure.
22  Q. But from the drawing that -- the
23 markings that you made on this floor plan of the
24 area that is visible with the security
25 surveillance tape that you saw, you can't even