# EXHIBIT D

010906

```
 8  other companies, and that they were putting out hits on him;
 9  surveillances that were far too technical and sophisticated
10  for anything that -- in the security world, in our city,
11  anyway.
12           So I tried to distract from -- well, that whole
13  thing, and just ask him normal, every-day questions about
14  himself.  And I found out we were the same age, and, just out
15  of conversation, that he grew up -- or, went to college, I
16  believe is what he said, in Michigan, which I found
17  interesting, because I am from Michigan, originally.
18           But, basically, it was just trying to deescalate his
19  anxiety at the time.
20  Q.   Okay.
21           Pretty much just talking story?
22  A.   Yeah.
23  Q.   Okay.
24           Were there any discussions that Mr. Arekat made
25  regarding his potentially moving his business, or at least
```

225

```
 1  starting up a business on the mainland.
 2  A.   Yeah.
 3           He had mentioned that he was opening a new office in
 4  California.  And I said, that's great, you know; he's doing
 5  good business here and there.
 6           And he was mentioning again about all the pressures
 7  that he was feeling from these other companies.  And I asked,
 8  maybe -- have you ever thought of just going -- taking your
 9  whole business over there, where you won't be bothered by
10  these people, if it's such a big deal?
11  Q.   What did he tell you?
```

Page 196

010906

12  A.  Uh, pretty much, not going to be bullied, you know.  And
13      I said, great.
14  Q.  Now, when you were sitting in the van with Mr. Arekat,
15      approximately how long would you estimate you were there?
16  A.  25-30 minutes, in the van.
17  Q.  Did you make any observations as to his behavior?
18  A.  Well, initially, the behavior was -- you know, he was
19      escalated -- he was upset because he was being arrested, or
20      being held, and he felt that he was being wrongfully held.
21          And then he went on to explain to me, the reason
22      that we have the wrong person is that he made these complaints
23      against these other companies, and that they are the ones that
24      should be arrested.
25          And then he went on to tell me about the elaborate

226

1   schemes of surveillance -- which I thought was a little too
2   much, a little over the top.
3   Q.  Okay.
4           Now, you have had experiences in the past, in your
5   days of patrol, I assume, with regard to executing MH-1's?
6   A.  Uh-huh.
7   Q.  Is that correct?
8   A.  Yeah.
9   Q.  Can you tell us, first of all, if there are different
10      ways -- at least from your training --
11  A.  Uh-huh?
12  Q.  -- your understanding if there are different ways to
13      execute a MH-1?
14  A.  Yeah.
15          Well, first of all, it would be, I'm being sent to a

Page 197

010906

16  scene because a person has been deemed to be qualified as this
17  MH-1, to transport them to a facility so that they can get
18  help.
19          And that would have been already preestablished by a
20  psychologist, or Sharon Black, or somebody of that authority,
21  and that -- had sent me there to pick them up.
22          The other way would be if I was just doing my job,
23  and I saw a person out on the street, or in a house, if I --
24  whatever kind of situation, but they displayed dementia, or a
25  type of -- some type of mental disorder, and they were a

227

1   danger to themself by the way that they were acting, or if
2   they had something like a tool or implement to hurt themself.
3   I would -- (incomprehensible) -- make those calls, again, to
4   Sharon Black, probably initially, and then through her to some
5   type of physician, or psychiatrist, and get that order.
6   Q.  I see.
7           So the first situation is where Sharon Black, or
8   whoever it is, a mental health expert, that goes ahead and
9   makes a determination, you as a patrol officer, or whatever
10  officer called upon to pick up the individual and transport
11  them to Queen's?
12  A.  Right.
13  Q.  The second situation, as you just explained, would be
14  where you are in the field --
15  A.  Through observation, yeah.
16  Q.  Okay.
17          In that situation, you would attest to what you are
18  seeing?
19  A.  Correct.